## H. Stuckey *v.* The State.

Charge of the Court. — The law of Texas is and has ever been sedulously careful to establish and preserve well-defined boundaries between the functions of the judge and those of the jury, and to guard the province of each against intrusion by the other. It requires the judge to deliver to the jury a written charge distinctly setting forth the "law applicable to the case," but strictly enjoins him from therein discussing the facts, weighing the evidence, summing up the testimony, or using any argument calculated to arouse the sympathy or passion of the jury. These injunctions exact from the judge, not merely that he refrain from positive expressions of the prohibited kinds, but that he avoid even the appearance of an intimation or the suggestion of the remotest inference from the evidence or the facts of the case on trial. Disregard of the law in these respects becomes especially material and prejudicial when, as in the present case, there was evidence which, if credited by the jury, tended to countervail the inculpatory evidence adduced by the State. See the opinion *in extenso*, and the application of these principles in this case.

Appeal from the District Court of Rains. Tried below before the Hon. G. J. Clark.

The appellant was indicted for the theft of a certain mare, worth $40 and belonging to one James Pope, in the county of Rains, on June 4, 1878. The trial resulted in a verdict finding the appellant guilty, and assessing his punishment at five years' confinement in the penitentiary.

James Pope, the principal witness for the State, testified

that at the time charged in the indictment, and for two years anterior thereto, he was the owner of an unbranded bay mare pony, which, about May or June, 1878, was running on the range some six miles from his house and in the county of Rains. In May or June, 1878, he missed her from the range and commenced looking for her. In his search for her he came to appellant's house, and, describing the animal to him, asked if he had seen such a mare. He said he had not. Witness left, and when he got to appellant's lot he saw his mare in the lot. Calling to the appellant, witness told him that the mare in the lot looked like the one he was looking for. They then went into the lot, and witness at once recognized the mare as his, and so told the appellant, who said he was sorry then that he had branded her, and that he had a mortgage on her, and would get the mortgage and show it to witness, who told him he did not care to see the mortgage, — that the mare was his, and was all he wanted. Appellant gave the mare up to witness, who took her home. When he found her in the appellant's lot, she was fresh-branded "JC" on the right-shoulder. The brand looked like it had not been done more than a week. Witness had given no consent for the defendant or any one to take his mare. When he claimed her, the defendant did not object to giving her up.

David Spicer, for the State, testified that a week or two before Pope got the mare from the defendant, witness helped the defendant pen and catch her. Defendant told witness that the mare was his, — that he had bought her of Rosa McCrury. Witness knew a bay pony that the McCrury women used to ride; it was a gentle pony, and a lighter bay than the one caught by defendant and witness. Witness looked for a brand, but could see none, and so told defendant, who then examined, and said he had found one on the right shoulder, and took his knife and traced it, marking out "JJ." Witness then thought he could dis-

tinguish a brand, but a very faint one if any. The pony was wild; they had to rope it before they could examine it.

This was the evidence for the State.

R. Robbins, for the defence, stated that he knew the McCrury pony, and saw the defendant hunting for it in May or June, 1878. Defendant described it to witness, who told him he had seen pretty much such a pony on the range, along with the Robbins stock of horses. Defendant and witness went together to look for the pony, and found it along with one of the horses, but they were so wild that they could not be approached close enough to examine the pony. Defendant said that was the pony he was looking for. About a week afterwards the defendant was riding the same pony at the mill in Emory. It then had upon the right shoulder a brand with two J's, one of them reversed, thus, "JL." It was plain and fresh; the burn from the branding-iron had not healed. This was only about a week before Pope took the pony away from the defendant. The McCrury women moved away from the county in 1876.

Virgil Gill, for the defence, testified that the defendant claimed to have purchased a bay mare pony from Mrs. McCrury, and he and witness hunted for it about the last of May, 1878. Witness knew the McCrury pony, and he and defendant finally came up with one which suited its description. When they came up with the pony in the woods, witness told defendant it was the McCrury pony, and they drove it to the defendant's house, a mile or so distant. Defendant rode the pony the next day to town and to mill. If it was not the McCrury pony, which witness had frequently seen, it resembled it very much in both size and color; and witness told the defendant that he (witness) would take it for the McCrury pony every time.

R. W. Spradling, for the defence, testified that he loaned his wagon and team, on one occasion, to the defendant for the purpose of taking Mrs. McCrury to Wood County.

She agreed to give the defendant a ten-dollar interest in a pony to take her, and he did so in witness's wagon.

William Bridges, for the defence, stated that in March or April, 1878, he heard Mrs. McCrury offer the defendant $10 to carry her home to Wood County, and propose to secure it by a mortgage on a bay mare pony which was running on the range near her former home. Defendant agreed to her offer, and went with her and a lawyer named C. A. Kirby to the latter's office, to draw up the mortgage. Defendant borrowed Spradling's wagon and team, and carried Mrs. McCrury away in it. Witness knew the pony she had owned in this county, and saw the pony claimed by Pope, and thought the latter exactly like the other.

In rebuttal, the State introduced Horace Martin, Esq., who testified that he had known C. A. Kirby in the latter's lifetime, and attended his funeral, in November, 1877, several months prior to the time referred to by the preceding witness.

*C. H. Yoakum*, for the appellant.

*Thomas Ball*, Assistant Attorney-General, for the State.

CLARK, J. It has ever been the aim and purpose of our law to separate with distinct and well-defined boundaries, the respective provinces of the judge and jury, and to guard with sedulous care against all invasions by the one upon the province of the other. This principle had become firmly established in our system of jurisprudence before the adoption of the Codes, and it was securely perpetuated among their many other salutary provisions.

The judge is required, after the argument of a criminal cause is concluded, to deliver to the jury a written charge, in which he shall distinctly set forth the law applicable to the case, but he shall not express any opinion as to the weight of the evidence, nor shall he sum up the testimony;

and it is further provided that it is beyond his province to discuss the facts, or use any argument in his charge calculated to arouse the sympathy or excite the passion of the jury. It is his duty to state plainly the law of the case. Code Cr. Proc., arts. 594, 595.

A charge is unexceptionable only when it states plainly and succinctly the law of the case, and any departure from this plain rule is liable to just criticism and oftentimes constitutes material error. The measure of the law is not filled by mere abstinence of the judge from any positive expression as to the weight of the evidence, or his refraining from a positive discussion of the facts. The spirit of the law requires of him to avoid even the appearance of an intimation as to the facts, and to so guard the language of his charge that no inference, however remote or obscure, may be drawn by the jury as to the facts in evidence from the charge as given them, which is made the law of the case.

Says Judge Roberts, in *Brown* v. *The State*, in discussing these provisions : "Language can hardly be more emphatic in separating and defining the respective provinces of the judge and of the jury. The restrictions imposed on the judge show that it was the intention of the Legislature to prevent the jury from being influenced in any way by the opinion of the judge, however communicated, as to what facts are proved, and as to the proper weight to be attached respectively to those facts, or any of them. * * * A charge, therefore, which extends beyond a plain statement of the *law* of the case, as required by the Code, may invade the province of the jury, the full and independent exercise of which has been so plainly and earnestly sought to be protected by the Legislature." 23 Texas, 201.

To the same effect is the language of Judge Bell in *Ross* v. *The State:* "The line which separates the province of the judge from that of the jury is oftentimes shadowy, and difficult to be traced. But, inasmuch as the Legislature has committed to the jury the right to exercise their indepen-

dent and unbiased judgment in determining upon facts, and has denied to the judge the right to comment upon the facts in evidence, the court should exercise the greatest care in framing instructions to juries, so as not to violate, in the least degree, the spirit of the law upon this subject." 29 Texas, 501.

Tested by these well-established rules, the charge in this case is not free from objection. The evidence for the prosecution tended to show that the defendant took the mare which he is charged with stealing from off the range near his home, placed a brand upon it, and that it was not his animal, but belonged to the owner alleged in the indictment. On the contrary, the evidence in defence tended to show that the taking was open, in the presence of another person, and done under a claim of ownership. The evidence being so evenly balanced, it was of material importance to the rights of defendant that the jury should be left to determine the facts, under the law, without any intimation from the court as to the guilt or innocence of the person on trial, or any expression from the court from which the jury could infer that the court had any opinion upon the facts.

The court instructed the jury upon four hypotheses leading to the conclusion of defendant's guilt, and upon one hypothesis from which they might deduce his innocence, and concluded his charge with a brief summary as to both conclusions. In the course of the charge, he informs the jury that " a man may steal in broad daylight, and in the presence of all his neighbors, as much so as in the night or in secret, but the manner of taking and using property may be considered by the jury in determining the intent of the defendant." And in the conclusion, the charge particularly prescribes the exact form of the verdict in case the jury should find the defendant guilty, but fails to tell them what they should do in case they should conclude that he was not guilty.

Whether or not the proposition that a man may steal in broad daylight, in the presence of all his neighbors, is correct in the abstract, we are of opinion that in this case it should have been omitted, and that its incorporation in the charge was prejudicial to the rights of the defendant. We are further of the opinion that the spirit, tenor, and effect of the charge as a whole were equally prejudicial, and that it tended to convey, by necessary inference, an impression upon the part of the court that the defendant was not innocent, and that the jury were not likely to reach that conclusion. In so far as the charge presents the issues arising upon the facts to the jury, it is not open to objection; but the court should have contented itself with a clear and simple presentation of those issues, leaving the jury free to exercise their intelligent judgment in the application of the law to the facts.

We deem it proper to add that, under the operation of our present admirable jury-system, the virtue and intelligence of the several counties are usually found in the jury-boxes, and trial judges need have no solicitude as to a proper discharge of their functions under the law. Instances are not likely often to occur wherein jurors will mistake their duties under the law, when the law applicable to the case has been plainly given them in the charge of the court.

Because of error in the charge, the judgment is reversed and the cause remanded.

*Reversed and remanded.*